**Walter I. BECHTEL, Plaintiff,**

v.

**PENSION BENEFIT GUARANTY CORPORATION, Defendant.**

**Civ. A. No. 83–0121.**

United States District Court,
D. Columbia.

July 10, 1984.

Jeffrey L. Gibbs, Washington, D.C., for plaintiff.

Renae R. Hubbard, Office of the General Counsel, Pension Ben. Guar. Corp., Washington, D.C., for defendant.

## MEMORANDUM

GASCH, District Judge.

This case presents the question of whether payments in excess of statutorily guaranteed benefits made by the Pension Benefit Guaranty Corporation (PBGC) to participants in terminated employee pension plans constitute overpayments that can be recouped by the PBGC. The payments here in question were made in the interim between the termination of the inadequately funded pension plan for employees of the bankrupt Alan Wood Steel Company of Conshohocken, Pennsylvania, and the time when payments were reduced to statutorily guaranteed amounts. The Court denied the plaintiff's motion for preliminary injunction, and the case is now before the Court on the parties' cross-motions for summary judgment.

BACKGROUND

On June 10, 1977, the Alan Wood Steel Company filed a Chapter XI bankruptcy petition in the Eastern District of Pennsylvania. Alan Wood had maintained a pension plan pursuant to a pension agreement between it and the United Steel Workers of America, AFL–CIO (USWA). All steelmaking operations at Alan Wood ceased and all Alan Wood employees were laid off by November 1, 1977. At that time, employees who were eligible for pension benefits under the plan were receiving pension benefits at levels specified in the plan.

Alan Wood filed a Notice of Intent to Terminate with the PBGC on May 26, 1978, proposing June 5, 1978 as the date of termination. In a letter from PBGC to the Alan Wood Pension Advisory Committee, dated June 22, 1978, PBGC indicated that the proposed date would not necessarily be the date of the plan's termination and that the Advisory Committee could continue making payments to participants and beneficiaries who had been receiving pension benefits when the Notice of Termination was filed and could commence payments to those who subsequently became eligible for benefits for reasons other than the plan's termination. The PBGC's letter went on to state:

In the course of the statutory termination procedure it may become necessary to adjust or recapture a portion of the amounts paid to participants or their beneficiaries if such amounts are in excess of benefits guaranteed under [ERISA]. Therefore, we recommend that you advise all participants receiving benefits that their benefits may be subject to adjustment or recapture if plan assets ... are insufficient to satisfy guaranteed benefits.

In July 1978, PBGC wrote to the advisory committee recommending discontinuance of monthly Social Security supplemental benefit payments[1] because such payments would not be guaranteed under ERISA. Pursuant to this request, payment of the Social Security supplements was discontinued effective August 1, 1978.

By agreement effective January 5, 1979, PBGC and Alan Wood established November 1, 1977, as the date of plan termination. By that agreement, PBGC also became trustee of the plan. Following this agreement, the participants' benefits continued to be paid at the same levels as those immediately prior to January 5, 1979. On February 27, 1979, PBGC hired Milliman & Robertson, Inc., an actuarial consulting firm, to calculate guaranteed benefits for

---

1. Social Security supplemental benefits were available to certain retirees who had not yet become entitled to Social Security benefits.

plan participants. The plan provides for a complicated benefit structure, making calculations difficult.

By letter dated July 19, 1979, PBGC informed participants that it had become trustee of the plan and that the plan termination date was November 1, 1977. The letter stated that no additional benefits would accrue after the termination date, that the guaranteed provisions of ERISA became effective on that date, and that PBGC could pay only those benefits guaranteed by ERISA.

On November 6, 1979, PBGC informed participants who had been receiving benefits in excess of guaranteed amounts that payments would be cut back to guaranteed levels. PBGC also informed participants that they would have to repay amounts received in excess of guaranteed amounts during the period since the date of plan termination. The letter further stated that repayment could be in a lump sum or by pro rata reduction of future payments. Payments at guaranteed levels began in January 1980. On or about November 16, 1982, PBGC notified each participant who had received the November 1979 letter that only excess payments received after June 5, 1978, would be recouped. Recoupment from participants who did not make lump sum repayments began with the February 1, 1983, benefit checks. As of September 13, 1983, PBGC was recouping benefit overpayments by a reduction in benefit payments to 635 Alan Wood participants.

## DISCUSSION

The Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, is designed to protect participants in employee benefit plans. *See* 29 U.S.C. § 1001. Title IV of ERISA insures employees against a complete loss of pension benefits in the event their employee pension plans terminate. 29 U.S.C. § 1301 *et seq.* Section 1301 [2] creates the PBGC to administer this insurance program.

If a pension plan terminates without sufficient assets to pay all vested benefits, the PBGC pays the benefits within certain limits. Section 1322(b) imposes limits on the amounts guaranteed to participants in inadequately funded terminated plans. Section 1361 provides that the PBGC cannot pay benefits above and beyond the limits imposed by Section 1322(b) and the other sections in subtitle B of ERISA.

Section 1342 empowers the PBGC to appoint a trustee to administer a terminating plan until the termination is complete. Between the time the plan is entrusted to the trustee and the time it is terminated, Section 1342(d) grants the trustee the power to "continue payment of some or all of the benefits which were being paid prior to his appointment." The issue presented by this suit is whether this portion of the statute, empowering the trustee to pay the full measure of benefits the plan's participants had been receiving prior to the trustee's appointment is inconsistent with Section 1322(b)(3), which places ceilings on the amount of benefits the PBGC may pay to employees whose pension plans are terminating without sufficient funds to cover all payments due.

■ In this case, the PBGC, as trustee of the terminating Alan Wood plan, paid to the employees amounts equal to the amounts the employees were receiving before the plan terminated. Once PBGC calculated actual guaranteed benefits, it sought to recoup the amount by which the interim payments exceeded guaranteed levels. The government [3] has broad powers to

---

**2.** All references to sections are to Title 29 of the United States Code.

**3.** The PBGC is an agency of the federal government, 29 U.S.C. § 1302, and PBGC monies are intermingled, for reporting purposes, with the regular budget of the federal government. 29 U.S.C. § 1305. The plaintiff has noted that the monies in question are not from the federal budget the way, for example, tax monies are.

Whether or not the PBGC is considered to be a government agency is important to the plaintiff's case. This is because the standard for whether a party is empowered to recoup monies owing it differs depending on whether the party is an individual or a government. The court finds that the PBGC is a government agency for purposes of this analysis, and thus has the

recoup monies owing it as a result of overpayments. *United States v. Wurtz*, 303 U.S. 414, 415, 58 S.Ct. 637, 638, 82 L.Ed. 932 (1938). It is, therefore, only necessary to inquire whether the payment of the benefits in question constituted overpayments such that the government is empowered to recoup them.

 Because the PBGC is statutorily liable for, and the employees are statutorily entitled to, only the amount of benefits that Section 1322(b)(3) guarantees, any payments made above and beyond the guaranteed amount prior to the plan's termination are recoupable as overpayments. There is a limit on what the PBGC can pay and that limit applies while the plan is being administered by a trustee. This fact is reinforced by the dictate of Section 1361 that the PBGC's payment of benefits under terminated plans be subject to the limitations in Section 1321 through Section 1341a. Under this statutory scheme, amounts paid above guaranteed amounts constitute overpayments.

Because the rights and obligations of the parties are fixed on the date the plan terminates, *Audio Fidelity Corp. v. Pension Benefit Guaranty Corp.*, 624 F.2d 513, 517 (4th Cir.1980), a participant's benefit level is determined as of that date. Yet the nature of pension plans is such that it may take some time to go through the complex calculations needed to determine exact guaranteed benefit levels for each employee. Such was, in fact, the case here.

Because of the difficulty in making the necessary computations, preliminary estimates of guaranteed levels at the time of termination in this case was impossible. PBGC has proposed a regulation to deal with this difficulty. 48 Fed.Reg. 211 (Monday, October 31, 1983). This regulation provides methods for calculating guaranteed benefits at the time of termination. It also prescribes rules for PBGC's recoupment of overpayments made after termination from plan participants or beneficiaries, such as the plaintiff in this case.

broad recoupment power accruing to the federal government.

In the present case, however, it was inevitable under this statutory scheme that between the plan termination date and the date by which guaranteed levels had been calculated, payments would be made at a level other than the guaranteed level. By imposing limits on the amount PBGC may pay, the statute necessarily anticipates that such overpayments will be recouped.

CONCLUSION

The provision empowering the plan trustee to pay out amounts at the same rates received prior to plan termination does not alter the statutory limits imposed on the amount of benefits to be paid by the PBGC. The amounts paid in excess of those limits are overpayments subject to ultimate recoupment now that statutory benefit entitlement calculations are complete. Accordingly, summary judgment is entered for the defendant.