# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 98-3757

_____

Brent Harrod, Hollis Clanton, Dale          *
McGinnis, Bryan Ferrell, Allen              *
Ferrell, Charles Ferrell, Billy Joe         *
Ferrell, John H. Harrod, Brad Harrod,       *
Charles Roy Harrod, Randy Hardin,           *
B.O. Temple, Steve Temple, Mark             *
Temple Estate,                              *
                                            *
           Appellants,                      *     Appeal from the United States
                                            *     District Court for the Western
     v.                                     *     District of Arkansas.
                                            *
Dan Glickman, Secretary of Agriculture,     *
on behalf of the U. S. Department of        *
Agriculture, Farm Services Agency,          *
                                            *
           Appellee.                        *

_____

Submitted: May 12, 1999
Filed: March 17, 2000

_____

Before BEAM, LOKEN, and HANSEN, Circuit Judges.

HANSEN, Circuit Judge.

The appellants are vegetable farmers in Arkansas who received disaster relief payments from the United States Department of Agriculture (the agency) for crop damage in 1989 due to weather-related conditions. The agency demanded a refund of these payments after learning that the appellants' crop damage was also due in part to the farmers' application of a chemical which they later learned had been defective. The farmers unsuccessfully appealed the administrative decision requiring them to reimburse the government, and they ultimately sought judicial review in federal district court. The farmers now appeal the district court's grant of summary judgment in favor of Dan Glickman, Secretary of the United States Department of Agriculture. We affirm in part and reverse in part.

I.

In 1989, the appellants' crops suffered weather damage from a late frost early in the growing season and excessive rain during the harvest season. These natural problems became exacerbated because the appellants had applied a chemical fungicide called Benlate to some of the crops, not knowing that the fungicide was contaminated with a defoliating herbicide. Not yet knowing or realizing that the chemical was contaminated, the appellants applied for and received weather-related disaster relief benefits from their county Agriculture Stabilization and Conservation Service (ASCS) office, pursuant to the Disaster Assistance Act of 1989, Pub. L. No. 101-82, 103 Stat. 564. This emergency disaster assistance was only available to farmers who suffered a crop loss of 50% or more that was due to weather-related conditions in 1989. See id. § 104(a)(1)(A), 103 Stat. at 570.

The appellants did not learn of the chemical contamination until after receiving their disaster relief benefits. They then sued the chemical's manufacturer, E.I. DuPont de Nemours and Company (DuPont) for the 1989 crop damage caused by the defective chemical and informed the agency that the defective chemical had also played a role in their crop losses. Appellants sought guidance from the agency concerning any

2

possible double recovery that might result from their civil suit against DuPont, but the agency offered no firm guidance. The appellants represent that four days before the DuPont trial, an attorney in the agency's regional counsel's office told them that the government would not be seeking reimbursement of the 1989 disaster relief benefits. The trial court then permitted DuPont to inform the jury of the amount of government benefits the farmers had received due to weather-related damage.

During the trial against DuPont, the appellants explained to the jury that the combination of poor weather and the defective chemical caused their crop damage. The farmers further represented to the jury that while only 30% of their crop damage was due to weather conditions alone, the "synergism" caused by the combination of the defective chemical and the poor weather conditions accelerated their crop damage. The jury, having been informed of the benefits the plaintiffs had received from the government, rendered a verdict in favor of the appellants in their civil suit against DuPont, awarding the farmers over $7 million in damages, without specifying whether this award was discounted due to the disaster relief benefits the farmers had received from the government. The damage award against DuPont was for crop losses sustained in both the 1989 and 1990 growing seasons.

In 1994, based upon the appellants' assertion at the DuPont trial that only 30% of their crop damage was caused by weather (as opposed to the 50% requirement of the statute), the deputy administrator reviewed the case and determined that the appellants' crop losses were not sufficiently caused by eligible weather conditions to qualify for disaster relief. The deputy administrator then demanded a refund of all disaster relief benefits previously paid to the appellants for the 1989 crop losses, and the appellants filed administrative appeals.

On March 29, 1995, the National Appeals Division partially granted the appeals in an opinion issued by Hearing Officer John Welch. Mr. Welch concluded that the deputy administrator erred by requiring the appellants to refund all of the disaster relief

payments. He concluded that to obtain relief payments, the crop loss must be solely due to eligible conditions, and a contaminated chemical is neither an eligible condition nor a natural related condition. (Appellant's App. at 97.) Mr. Welch said there was "no evidence to support Appellants' position that use of the contaminated Benlate and disastrous weather conditions acted in combination to cause the crop loss." (Id.) He also said that the farmers had not attempted to specifically quantify the extent of the crop losses that were caused by the contaminated Benlate. Mr. Welch noted that the farmers speculated during the hearing that the losses may have been 30% absent the chemical contamination, but noted that a 30% loss would not qualify for disaster payments. Establishing the percentage of crop loss attributable to eligible disaster conditions is the appellants' burden, and Mr. Welch concluded that "[a]ppellants have not established any of the crop losses where they used the contaminated Benlate were attributable to eligible disaster conditions." (Id. at 98.)

The hearing officer, Mr. Welch, ultimately allowed the appellants to retain payments for any crops not listed on the Benlate manufacturer's label, assuming that farmers would not have sprayed crops with Benlate absent a manufacturer's recommendation. Conversely, the hearing officer required the appellants to return all payments for any crops listed on the manufacturer's label, again assuming the farmers would have sprayed all crops as recommended by the manufacturer. The hearing officer also concluded that a recently enacted 90-day limit on the government's ability to recover payments made in error did not apply retroactively to preclude recovery by the government of the benefits paid in this case.

On July 21, 1995, the Acting Director for the National Appeals Division upheld most of Mr. Welch's decision but remanded for a specific determination of which plants were actually sprayed with the Benlate, as opposed to relying on assumptions made from the manufacturer's label. On remand, another hearing officer, Mr. Lane Newman, made very detailed fact-findings determining which crops had been sprayed, but did not independently determine what percentage of the damage was caused by the weather.

4

Instead, in accordance with Mr. Welch's opinion, the new hearing officer concluded that benefits for any 1989 crop that was actually sprayed with Benlate must be refunded. On final review, the Director upheld the new hearing officer's decision.

The appellants sought judicial review in federal district court. The district court granted summary judgment in favor of the Secretary, finding substantial evidence to uphold the agency's final determination. The farmers now appeal to this court.

## II.

## A.

The appellants first contend that the agency's decision to require reimbursement was arbitrary and capricious. We review de novo the district court's review of an administrative decision. See Von Eye v. United States, 92 F.3d 681, 685 (8th Cir. 1996). We will uphold the agency's decision unless it is not supported by substantial evidence on the whole record or unless the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

> An arbitrary and capricious decision exists where an "agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Von Eye, 92 F.3d at 685 (quoting Motor Vehicle Mfrs. Ass'n v. State Farm, 463 U.S. 29, 43 (1983)).

Our review of the record convinces us that the district court correctly concluded (with one exception) that the agency decision was not arbitrary and capricious. The agency's decision to require reimbursement was based upon the appellants'

5

representation in their suit against DuPont that only 30% of their crop damage was due to weather alone. They represented that the remainder of the damage was due to the contaminated Benlate or the combination of weather conditions and the contaminated Benlate. The agency determined, however, that any damage or accelerated damage caused by the Benlate is not within the scope of the statute, which allows disaster relief "because of damaging weather or related condition[s]." 103 Stat. 564, 570; § 104(a)(1)(A) (1989). This determination was based upon factors listed in the appropriate regulations, defining an "eligible disaster" as follows:

> damaging weather, including but not limited to drought, hail, excessive moisture, freeze, tornado, hurricane, or excessive wind, or any combination thereof; or related condition, including but not limited to insect infestation, plant disease, or other deterioration of a crop of a commodity, including aflatoxin, that is accelerated or exacerbated naturally as a result of damaging weather occurring prior to or during harvest which occurred in 1988 or 1989 as determined by CCC.

7 C.F.R. § 1477.3(f) (1990). The agency concluded that the contaminated chemical, Benlate, is not a "related condition" that accelerates crop damage "naturally" within the meaning of this regulation. (See Appellant's App. at 97.) Thus, even accepting the appellants' assertion that the toxin of the contaminated chemical made the plants more vulnerable to weather damage, the agency concluded that this aggravated susceptibility caused by the contaminated chemical was neither a natural accelerant nor a weather-related condition within the scope of the regulations and the statute.

The farmers had the burden to demonstrate that weather-related conditions alone caused a loss of at least 50 % of their crops. Hearing Officer Welch said that neither party here " has attempted to specifically quantify the extent of the crop losses" but that "Appellants speculated the losses may have been approximately 30% if the Benlate they used had not been contaminated." (Appellants' App. at 97.) He concluded that "Appellants have not established any of the crop losses where they used the

contaminated Benlate were attributable to eligible disaster conditions." (<u>Id.</u> at 98.) Finally, he stated, "[t]he best available evidence indicates that major crop losses would have occurred because of using the contaminated Benlate, despite any adverse weather that may have occurred." (<u>Id.</u> at 98.)

We conclude that the agency determination is a reasonable interpretation of the regulation and the statute. We believe that the agency did not act arbitrarily in relying on the farmers' representation at trial and at the hearing that only 30% of the damage was caused by the weather alone. The appellants' reliance on the combined effect or "synergism" between the Benlate and the weather conditions resulted in a simple failure to prove that weather conditions alone caused at least 50% of their damage. The district court did not err (with the exception hereinafter explained) by concluding that the agency decision was not arbitrary or capricious.

The appellants assert that Hearing Officer Welch overlooked evidence of the extent of weather damage. They point to evidence that the appellant Mr. McGinnis sustained an overall 88% loss on his farm, even though only 11 acres had been sprayed with Benlate, and the remaining 15 acres had not been sprayed and thus were affected by weather only. While this evidence may have tended to support Mr. McGinnis's claim that he sustained enough weather damage to entitle him to benefits (and we note that Mr. McGinnis was not required to repay the benefits he received on the 15 acres), we cannot say that the hearing officer's decision was arbitrary in the absence of any real attempt by the appellants to quantify the extent of damage caused by weather alone on the acres that were sprayed with the contaminated Benlate. <u>See</u> <u>Harwood v. Apfel</u>, 186 F.3d 1039, 1042 (8th Cir. 1999) (noting our task is not to reweigh evidence and we may not reverse merely because substantial evidence would have supported the opposite conclusion or merely because we would have decided the case differently).

The one exception involves the disaster benefits sought to be recovered from Mr. Charles Ferrell for his 20 acres of tomatoes. Our review of the record before the agency has convinced us that the agency's action in requiring Mr. Ferrell to repay all of the benefits he received for his 20 acres of tomatoes is arbitrary and not supported by substantial evidence. Indeed, it is contrary to the agency's own fact-findings. On remand, with respect to Mr. Ferrell's crop, Hearing Officer Newman found as follows:

> Frost killed all 20 acres of the first planting of tomatoes and he replanted only 4 acres of tomatoes with plants that were left over [but which had been treated with the contaminated Benlate]. The remaining 16 acres [of originally planted but frost devastated tomatoes] were allowed to sucker out. He elected not to make a claim against DuPont on these plants since he felt the freeze was what caused the damage.

(Appellants' App. at 68.)

The hearing officer's findings that frost "killed all" of Mr. Ferrell's first planting and that 16 acres of that first planting were thereafter not replanted but allowed to sucker out means that the killing freeze (an eligible disaster under the regulations) was alone the cause of Mr. Ferrell's crop loss on the 16 unreplanted acres. Accordingly, we must reverse the district court's summary judgment for the agency with respect to Mr. Ferrell's unreplanted 16 acres, and we remand his complaint for further proceedings consistent with this opinion.

Absent any attempt by the other appellants to quantify the extent of damage due to eligible conditions, we remain convinced that the agency decision did not overlook important evidence, and its decision was not arbitrary or capricious as to them, or as to Mr. Ferrell's four replanted acres.

B.

8

The appellants also contend that the agency's attempt to seek reimbursement of their disaster relief payments in 1994 was untimely, because the agency action was final when the government paid the benefits in 1989, and the agency had no authority to seek reimbursement years after a final agency action. We disagree.

We have long held that the common law permits the government to recover funds that its agents wrongfully or erroneously paid, even absent specific legislation authorizing the recovery. See Collins v. Donovan, 661 F.2d 705, 708 (8th Cir. 1981); see also Texarkana Metro. Area Manpower Consortium v. Donovan, 721 F.2d 1162, 1164 (8th Cir. 1983). The Supreme Court has stated, "Ordinarily, recovery of Government funds, paid by mistake to one having no just right to keep the funds, is not barred by the passage of time." United States v. Wurts, 303 U.S. 414, 416 (1938). The government's right to recover funds paid out erroneously "is not barred unless Congress has clearly manifested its intention to raise a statutory barrier." Id.

No statutory barrier to such a recovery existed at the time the benefits were paid in this case. The statutes under which all parties operated when benefits were paid made no mention of any limit on the government's ability to recover erroneously paid funds. Further, the regulations in effect at that time provided appellants with notice that they would be required to refund any excess payments resulting from erroneous information. See 7 C.F.R. § 1477.12 (1990). The regulations specifically mandated that the state committee must require the county committee to correct any action taken by the county committee that is not in accordance with the law. Id. § 1477.2(c)(1). Also, the regulations clearly stated that no delegation of authority to a state or county committee precluded the agency "from determining any question arising under the program or from reversing or modifying any determination made" by a state or county committee. Id. § 1477.2(e). Similarly, the appeal regulations in effect at the time (though their direct authority is suspect since no appeal from the original decision to pay the benefits was taken in this case) specified that no delegation of authority to a state or county committee would preclude the Administrator "from determining at any

9

time any question arising under the programs to which the regulations in this part apply or from reversing or modifying any determination made by a county or State committee or the Deputy Administrator." Id. § 780.12 (emphasis added). Consistent with the governing statutes, these regulations imposed no time restraint on the agency's ability to seek a refund of erroneously paid funds.

The appellants contend that circuit precedent requires that the final agency decision to award the disaster relief benefits (from which the appellants took no appeal) should be final against the government as well, citing United States v. Kopf, 379 F.2d 8 (8th Cir. 1967). In Kopf, two producers applied for and received benefits under a farm grain program in which benefits are determined by a county committee on the basis of crop yield. Id. at 11-12. Under this program, the statute provided that the facts constituting the basis for any payment "shall be final and conclusive and shall not be reviewable by any other officer or agency of the Government." Id. at 12 (quoting 7 U.S.C.A. § 1385). On its own accord, the county committee decided to recalculate two prior years of the producers' crop yields, even though the producers had substantially complied with the program and there was "no showing that the original hearing did not fully conform to the regulations." See id. at 12. The court held that the supervisory power of the agency "does not go to an issue . . . which has been finally determined after an evidentiary hearing held pursuant to the regulations." Id. at 13. The court held that "no basis exists in the absence of statutory authorization for permitting without limitation a redetermination of the yield under the circumstances of this case." Id. at 14. The farmers were entitled to a firm determination of payment based upon yield before planting time or very few would participate in the program. The court stated, "Fairness requires that a decision final as to one party should also be final as to the other, absent clear statutory authority to the contrary." Id. at 12.

We conclude that Kopf is distinguishable. In the present case, the concern is not about a farmer's right to payment under a program with which he fully complied. Instead, the concern is whether the government can recoup a payment erroneously

10

made, to which the farmer is not entitled under the program. Although the appellants had honestly represented a 50% crop loss due to weather-related conditions at the time they applied for benefits, they asserted at the civil trial against DuPont that only approximately 30% of the loss was caused by the weather alone. The government sought reimbursement following this revelation. The government was not attempting to redefine the playing field after the farmers had made a planting commitment relying on the government's program payments, as had been the case in Kopf. Additionally, the controlling statute in Kopf stated that the facts serving as the basis for a payment were final and conclusive and not reviewable, whereas no such statute exists to govern this case. The regulations cited above indicate that at the time the disaster benefits were awarded in this case, the appellants were on notice that they would be required to refund any excess payment made from erroneous information and that there was no time limitation on the agency's ability to seek reimbursement of erroneously made disaster relief payments. Thus, this case is not controlled by Kopf.

The more difficult question arises from the timing of a new statute that does limit the government's ability to recover erroneously paid funds. In late 1990 (after the disaster benefits were paid in this case but before the agency sought to recover the funds), Congress enacted a 90-day limitation on the government's ability to seek recovery of funds paid out in error. Specifically, the new rule provides as follows:

> Decisions of the State and county committees . . . made in good faith in the absence of misrepresentation, false statement, fraud, or wilful misconduct, unless otherwise appealed under this section, shall be final, unless otherwise modified under subsection (f) of this section within 90 days, and no action shall be taken to recover amounts found to have been disbursed thereon in error unless the producer had reason to believe that the decision was erroneous.

7 U.S.C.A. § 1433e(g) (1994) (repealed, but see 7 U.S.C.A. § 7001(a)(2), (3) (West Supp. 1999)). The appellants argue that this rule applies to bar the agency's 1994

11

decision to seek reimbursement of their 1989 disaster relief benefits. The agency and the district court disagreed, concluding that the rule applies prospectively only, and consequently, the new 90-day rule does not preclude recovery of benefits paid before its enactment.

There exists a well-settled presumption against applying a statute retroactively to conduct occurring before its enactment. See Landgraf v. USI Film Prod., 511 U.S. 244, 278-80 (1994). Importantly, a statute does not operate retroactively merely because it is applied to conduct that occurred prior to the statute's enactment. Id. at 269. A more complete statement of the presumption is that courts should not apply "'statutes affecting substantive rights, liabilities, or duties to conduct arising before their enactment,' absent an express statutory command to the contrary." Viacom Inc. v. Ingram Enters., Inc, 141 F.3d 886, 888 (8th Cir. 1998) (quoting Landgraf, 511 U.S. at 278).

Thus, we first determine whether the statute evinces any clear expression of congressional intent on whether the statute should be applied to cases arising before its enactment. See Maitland v. University of Minn., 43 F.3d 357, 361 (8th Cir. 1994) (citing Landgraf, 511 U.S. at 280). If the statute reveals Congress's intent that it apply to cases arising before its enactment, "we will give effect to that intent unless such an application would violate the Constitution." Id. Absent any clear expression of congressional intent, we consider whether applying the statute to events occurring before its enactment would have a true retroactive effect, "i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." Landgraf, 511 U.S. at 280.

The statute setting forth the 90-day rule evinces no congressional intent on whether it should be applied to cases arising before its enactment. The express language focuses on the initial agency decision, stating that the decision is final unless

12

appealed or otherwise modified within 90 days. To apply this statute to the 1989 benefits determination would require us to apply the rule to a decision made prior to its enactment. The statute contains no clear congressional intent that it should be applied retroactively to agency decisions made prior to its enactment. Absent a clear congressional expression of intent, we must consider whether such an application would have a true retroactive effect. Applying the statute to the present situation would insulate the appellants from having to pay back funds erroneously obtained from a government program. At the same time, such an application would burden the government's previous common law right to recover payments made in error at any time. Although private rights would not be impaired, applying the statute here would impair the government's rights and impose a new duty with which the agency could not have timely complied because the original decision to award benefits was made in 1989, well outside the new 90-day period.

The appellants argue that the 90-day rule applies because it is procedural only and does not affect substantive rights. In general, no retroactivity concerns arise from applying changes in procedural rules to suits arising before their enactment. See Landgraf, 511 U.S. at 275. We held in Garfield v. J.C. Nichols Real Estate, 57 F.3d 662, 665 (8th Cir.), cert. denied, 516 U.S. 944 (1995), a case arising under the Age Discrimination in Employment Act, that a new rule requiring the plaintiffs to file suit within 90 days after receiving their right-to-sue letter from the agency was procedural and did not raise concerns over retroactivity simply because the conduct giving rise to the suit occurred prior to the enactment of the new 90-day rule. In Garfield, the plaintiffs had been terminated before enactment of the rule but received their right-to-sue letter (from which they had 90 days to file suit under the new rule) after the rule was enacted. The application of the new rule in that situation did not deprive the plaintiffs of a cause of action but merely prescribed the time period within which they were required to file their action. They had notice of the rule and an opportunity to fully comply with it, contrary to the facts of the case before us.

13

Applying the 90-day rule in the present situation is not a mere procedural limit on the remedy but would substantively eliminate the government's common law right to recover funds erroneously paid out.

> When application of a new limitation period would *wholly eliminate* claims for substantive rights or remedial actions considered timely under the old law, the application is impermissibly retroactive. The legislature cannot extinguish an existing cause of action by enacting a new limitation period without first providing a reasonable time after the effective date of the new limitation period in which to initiate the action.

Nichols v. Bowersox, 172 F.3d 1068, 1073 (8th Cir. 1999) (internal quotations omitted). The 90-day rule in this case, while not exactly a statute of limitations on the commencement of a lawsuit, nonetheless presents an analogous situation. The government's right to recover is totally lost if the statute is applied because the 90-day period prescribed by the new rule had expired even before the rule was enacted, leaving the government no way to comply with the rule in this case. This burden on the government's otherwise unhampered ability to recoup government money paid out in error amounts to a true retroactive effect, which is not favored in the law. Because a contrary congressional intent is absent, we avoid this retroactive effect by holding that the 90-day rule does not govern this case. See Landgraf, 511 U.S. at 280.

## C.

Appellants also argue that they were entitled to equitable estoppel or equitable relief from the agency. The farmers assert that they tried to resolve the issue of reimbursement with the agency through meetings and correspondence with state office personnel and regional counsel for the United States Department of Agriculture prior to their trial against DuPont, but they received no definite response or resolution (which the agency attributes to the appellants' failure to quantify the amount of damage due to eligible conditions alone). Appellants assert that on the eve of their trial against

14

DuPont, an attorney in the agency's office of regional counsel advised their counsel during a telephone conversation that the agency would not be seeking repayment due to a new regulation that she represented as only allowing repayment in the event of fraud. (Appellants' App. at 118.) Appellants notified the judge of this conversation on the first day of their civil trial against DuPont, and the judge then ruled that DuPont could introduce evidence of the federal disaster payments that the appellants had received on account of weather-related conditions. Appellants assert that they are entitled to equitable estoppel against the government on the basis that their reliance on the government's attorney's oral statement that the agency would not seek reimbursement adversely affected the outcome of their trial against DuPont and has put them in a double bind. They assert the jury reduced their damages against DuPont by the amount of the government benefits they had received, and now the government wants its money back.

"[T]he government may not be estopped on the same terms as any other litigant." Heckler v. Community Health Servs., Inc., 467 U.S. 51, 60 (1984). "[T]he Supreme Court has repeatedly indicated that an estoppel will rarely work against the government." Conforti v. United States, 74 F.3d 838, 841 (8th Cir.) (citing Office of Personnel Mgmt. v. Richmond, 496 U.S. 414, 423 (1990)), cert. denied, 519 U.S. 807 (1996). In fact, "in the absence of affirmative misconduct by the government, not even the temptations of a hard case . . . justify applying an estoppel against the [government]." Id. (internal quotations and citations omitted). Furthermore, courts have a duty to observe the conditions defined by Congress for paying out funds from the public treasury. See Schweiker v. Hansen, 450 U.S. 785, 788 (1981).

The present case involves purely private litigants attempting to preserve a financial advantage by estopping the government from recovering federal money to which the litigants are not entitled under the law. The only "affirmative misconduct" alleged is that the government's attorney informed the appellants that the government would not seek reimbursement due to a recently enacted regulation. We held earlier

15

in this opinion that the statute articulating the 90-day rule does not apply to this case because its application to these facts would have retroactive effect. The alleged informal statement of the government's attorney cannot operate to expand the scope of a statute to apply retroactively where Congress has not expressly provided for retroactive effect. See Heckler, 467 U.S. at 63 (noting "those who deal with the Government . . . may not rely on the conduct of Government agents contrary to law"). Given the overwhelming weight of the cases holding that estoppel will not lie against the government, it was, in our view, unreasonable for the appellants to rely on the oral statement of the government's attorney, particularly when the retroactive effect of the new rule was questionable. We see no basis on which to estop the government from recouping the funds erroneously paid to the appellants in this case. See also Richmond, 496 U.S. at 422 (noting that the Supreme Court has reversed every finding of estoppel against the government that it has reviewed).

We similarly reject the appellants' contention that the Secretary did not consider equitable relief. The agency decision specifically states, although without elaboration, that the facts of the case do not warrant equitable relief. This statement, though cryptic, demonstrates that the agency considered the issue, and we, after a thorough review of the record, agree with the agency's assessment that equitable relief is not warranted in this situation.

## III.

Accordingly, we affirm the judgment of the district court, except as to Mr. Ferrell's 16 acres. As to that matter we reverse the district court's judgment for the agency and remand the case for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.